IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**LATAYA COBB**                                                                                       **PLAINTIFF**

v.                                                                             CAUSE NO. 1:11CV32-LG-RHW

**SINGING RIVER HEALTH SYSTEM**                                                **DEFENDANT**

<u>MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

**BEFORE THE COURT** is the Motion for Summary Judgment [42] filed by Singing River Health System. LaTaya Cobb has filed a response in opposition to the Motion, and Singing River has filed a reply. Upon reviewing the submissions of the parties and the applicable law, the Court finds that Singing River is entitled to judgment as a matter of law.

## FACTS

On February 24, 1997, Cobb, an African-American female, was hired by Singing River as a part-time unit clerk. (Def.'s Mot., Ex. A at 18, ECF No. 42-1). She later received her nursing degree and was hired by Singing River to work as a full-time registered nurse in the Pascagoula hospital in October of 2002. (*Id*. at 40-41; Def.'s Mot., Ex. C, ECF No. 42-3). She requested to be changed from full-time status to PRN status, where she would be scheduled to work on an as-needed basis. (Def.'s Mot., Ex. A at 23, 41-42, ECF No. 42-1). Initially, she worked in the orthopedic department, but she was later transferred to the pediatric department. (*Id*. at 41, 44). During this time, Cobb claims that she witnessed Caucasian nurses in the pediatric department attempting to get certain nurses in trouble so that they

would be terminated. (*Id.* at 191-96). Some of the nurses that were targeted were African-American, but Cobb admitted that she cannot say whether these alleged events were race-related. (*Id.* at 192-93, 196). She reported this alleged behavior to the hospital and one of the pediatricians that worked at the hospital. (*Id.* at 197-200). She transferred to Singing River's Ocean Springs Hospital on March 15, 2004, before the matter was resolved. (*Id.* at 201).

While her son was a patient in the pediatric department, Cobb spoke with Cynthia Oberhoff, the nurse manager of the pediatric floor, about the possibility of returning to work at the Pascagoula Hospital. (*Id.* at 58-60; Def.'s Mot., Ex. D, ECF No. 42-4). After that meeting, Cobb initially worked at both the Ocean Springs Hospital and the Pascagoula Hospital, but she eventually worked solely at the Pascagoula Hospital as a PRN nurse. (Def.'s Mot., Ex. A at 60, 64, ECF No. 42-1). She made the decision to return to Pascagoula, because she wanted to work in pediatrics. (*Id.* at 62-64).

On May 6, 2009, Cobb met with Oberhoff and informed her that the other nurses were treating her "indifferently" because of her race.[1] *Id.* at 85. She requested this meeting, because she was frequently being pulled to work in other departments. *Id.* at 81-82. In addition, on the day of the meeting, she had been pulled to work in the obstetrics department, but she was called by a Caucasian

---

[1] In her deposition and in statements made to Singing River, Cobb used the term "indifferently," but in her brief filed in response to Singing River's Motion for Summary Judgment, she uses the term "differently." (Def.'s Mot., Ex. A at 85, ECF No. 42-1; Def.'s Mot., Ex. D at 2, ECF No. 42-4; Pl.'s Brief 1, ECF No. 46).

nurse, who asked her to return to the pediatric department, so that the Caucasian nurse could go home early. (*Id.* at 96-97, 102). This upset Cobb and was the primary factor that caused her to request the meeting with Oberhoff. (*Id.* at 103). Cobb told Oberhoff that she wanted to decrease her hours and eventually leave her job, because she did not feel that she had job security. (*Id.* at 101-02). Cobb claims that Oberhoff told her that the other nurses wanted Cobb to leave. (*Id.* at 102). Oberhoff denied the other nurse's request to leave early, and she permitted Cobb to return to work in the obstetrics department that day. (*Id.* at 102-04).

Although she did not go into further detail at the meeting with Oberhoff, Cobb now claims that the following events constituted "indifferent" treatment at the hospital: (1) on one occasion, Cobb was asked to perform nurse's aide duties while there was a nurse with less experience on the floor; (2) one of the Caucasian nurses called her at home and told her that the Caucasian nurse that was scheduled to be pulled to work in another department that day refused, and therefore Cobb would be pulled instead; (3) on one occasion, Cobb heard a Caucasian nurse say that they were going to "get" Cobb for abandonment, because the nurse believed Cobb was not present; (4) Cobb was pulled to work in another department and then asked to return to pediatrics on approximately three occasions; (5) an Asian nurse called Cobb and questioned why Cobb had taken herself off the schedule; (6) Cobb was warned by others, including another African-American nurse, that she should be cautious with the Caucasian nurses on the floor; (7) on one occasion, some of the nurses spread a rumor that Cobb and a Caucasian nurse were using narcotics; and

(8) when Cobb transferred back to Pascagoula, Oberhoff told Cobb she would not be required to participate in orientation, but she was required to participate in orientation.  (*Id*. at 88-90, 104, 245-46, 273-76).

On May 19 and May 22, 2009, Cobb was not scheduled to work, and she admits that she did not work those days.  On May 19th, she claims that she briefly went to work to take a tuberculosis test, and on May 22nd, she returned to get the test read.  She also claimed that she pulled one patient's paper file on May 22nd, and briefly looked at the file.  Cobb's young sons accompanied her to the hospital that day.  Cobb now agrees that she was not entitled to payment for her trips to the hospital on May 19th and 22nd.  However, Cobb made a notation on the back of a staffing sheet concerning these two visits to the hospital.  The notations concerning Cobb state:

> 5/22/09 - chart, LaTaya Cobb 2º 0 badge 3-5
> 5/19/09 - chart LaTaya Cobb 0 badge 9-1040

(Def.'s Mot., Ex. G, ECF No. 42-7).  In an affidavit, Oberhoff explained:

> All employees are required to clock in when they arrive for work and clock out when they depart.  If employees do not clock in or out they may be disciplined according to Hospital policy.  However, the Hospital will pay the employee for time worked if they do not clock in or out upon request and after investigation.  The nurses on the Pediatric floor wrote notes to me on the back of the schedule (referred to as the "staffing sheet") to advise me of issues that affect their pay . . . . [I]f a nurse could not clock in because they forgot to bring their badge to work, they could advise me of the hours they worked on the staffing sheet so I could make sure they were paid.

(Def.'s Mot., Ex. D at 2-3, ECF No. 42-4).

Upon receipt of the notations concerning Cobb on the back of the staffing

sheet, Oberhoff asked Cobb to meet with her and requested an explanation. (*Id.* at 3). Oberhoff claims that Cobb told her that she had come to work to complete documentation on patient medical records, and she did not clock in because she had forgotten her badge. (*Id.*) Oberhoff investigated whether Cobb had worked on those two days. (*Id.*) She interviewed staff, and no one could confirm that Cobb was present on those days. (*Id.*) She also consulted with the Information Systems department, since medical charting is performed online, and learned that Cobb had not accessed any patients' medical records on May 19 or May 22. (*Id.*) Oberhoff also met with the director of security, who reviewed surveillance tapes and determined that Cobb did not enter or exit the pediatric department on May 19th. (*Id.*) He also determined that Cobb entered the pediatric department while accompanied by her children and then exited ten minutes later. (*Id.*) As a result of these findings, Oberhoff recommended that Cobb be terminated for making a fraudulent request for payment for time not worked. (*Id.*) Cobb appealed her termination, but her appeal was denied. (*Id.*)

On June 24, 2009, Cobb filed a charge of discrimination with the EEOC alleging race discrimination, retaliation, and harassment, and she received notice of her right to file a lawsuit. She filed this lawsuit on August 24, 2010, alleging race discrimination and retaliation pursuant to Title VII, 42 U.S.C. §§ 1981 and 1983. (Compl. 3, ECF No. 1-2). She seeks reinstatement, back pay, compensatory damages, punitive damages, attorney's fees, costs, and expenses. (*Id.* at 4). In her

brief in opposition to Singing River's Motion for Summary Judgment, she concedes that Singing River is entitled to summary judgment concerning her race discrimination claim filed pursuant to Title VII, 42 U.S.C. §1981, and 42 U.S.C. §1983, but she claims that Singing River is not entitled to summary judgment concerning Singing River's retaliation claim. Singing River also seeks summary judgment as to any disparate impact or intentional infliction of emotional distress claim that Cobb may have. However, Cobb did not assert such claims in either her Complaint, Response, or brief. Therefore, it is not necessary for the Court to consider Singing River's arguments concerning disparate impact and intentional infliction of emotional distress.

## DISCUSSION

In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she participated in an activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the materially adverse action. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008). "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate . . . non-retaliatory reason for its employment action." *Aryain*, 534 F.3d at 484 (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007)). "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy*, 492 F.3d at 557. If the employer satisfies this burden, the plaintiff then bears the ultimate burden of proving that the employer's

proffered reason is not true but instead is a pretext for the actual retaliatory reason. *Id.* "The proper standard or proof . . . [for] a Title VII retaliation claim is that the adverse employment action . . . would not have occurred 'but for' [the] protected conduct." *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007) (quoting *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005)).

> The close timing between plaintiff's protected activity and alleged retaliatory action may help establish the causal connection element of a prima facie retaliation claim . . . . However, summary judgment for defendant is proper when plaintiff presents "no evidence of retaliation save temporal proximity" to rebut defendant's proffered reason and overwhelming evidence that plaintiff was fired because of poor performance and improper work conduct.

*Dixon v. Comal Cnty. Tex.*, 447 F. App'x 638 (5th Cir. Nov. 1, 2011) (citing *Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997); *Strong*, 482 F.3d at 808). The same analysis is utilized for retaliation claims asserted pursuant to Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 166 (5th Cir. 2007).

In her brief, Cobb points out that she met with Oberhoff on May 6, 2009, to complain that she was being treated differently because of her race, and on June 3, 2009, she was terminated.[2] (Pl.'s Brief 1, ECF No. 46). Cobb claims that she has set forth a prima facie claim for retaliation, because she has shown that Singing River terminated her less than one month after she complained of race

---

[2] On the other hand, at her deposition, Cobb expressed her belief that the problems began when she told a fellow nurse that she was going to speak with someone in human resources in order to find out why she was being treated "indifferently." (Def.'s Mot., Ex. A at 249-51, 278, ECF No. 42-1).

discrimination. (*Id.* at 3-4). The Court will assume for purposes of the pending motion that Cobb has a prima facie claim for retaliation, and the Court will consider whether Singing River has stated a legitimate, non-retaliatory reason for Cobb's termination.

Singing River asserts that it terminated Cobb, because she made a fraudulent request to be paid for time not worked. (Def.'s Mot., Ex. D at 3, ECF No. 42-4). This is a legitimate, non-retaliatory reason for termination.

Cobb claims that she can prove that Singing River's reason for terminating her was pretext for retaliation, because she denies falsifying her time records. (Pl.'s Brief 4, ECF No. 46). However, Cobb acknowledged at her deposition that in the time entries at issue she indicated that she was working on patient charts on the two days in question, since she wrote the word "chart" in each entry. (Def.'s Mot., Ex. A at 141-42, 145, ECF No. 42-1). Cobb also admits that on one of those days she did not even look at a chart, while on the other day, she merely pulled a chart and looked at it for about ten minutes while her children waited on her. (*Id.* at 126, 128, 132-33, 141, 147-48). Cobb also admitted that she never told anyone other than her attorney that the times written in the time entries were not in her handwriting. (*Id.* at 155). Cobb conceded that the time entries would have led someone to believe that she was requesting payment, but she claims she told Oberhoff that she did not want to be paid for those entries after she was confronted about the entries. (*Id.* at 150-51).

Even if Singing River incorrectly determined that Cobb made a fraudulent

request for payment, that does not tend to show that Singing River retaliated against Cobb. *See Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (holding that an employer's honest belief in a non-discriminatory reason for discharge, even if incorrect, is not discrimination). Furthermore, employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of employment decisions nor . . . to transform the courts into personnel managers." *Equal Emp't Opportunity Comm'n v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995). Thus, employers are not required to make proper decisions, only non-discriminatory ones. *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). As a result, the proper inquiry in the present case was whether Singing River terminated Cobb as retaliation for her alleged complaint of race discrimination or whether it terminated her because it believed she had submitted a fraudulent request for payment. Therefore, Cobb's assertion that she did not submit a fraudulent request does not create a genuine issue of material fact regarding her retaliation claim. There is no evidence or indication that Singing River retaliated against Cobb. Instead the summary judgment evidence taken in the light most favorable to the Plaintiff indicates that Singing River believed in good faith that Cobb made a fraudulent request for payment. As a result Singing River is entitled to summary judgment as to Cobb's retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court finds that Singing River is entitled to judgment as a matter of law as to all of the claims asserted by Cobb.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the Motion for Summary Judgment [42] filed by Singing River Health System is **GRANTED**. This lawsuit is hereby **DISMISSED WITH PREJUDICE**.

**SO ORDERED AND ADJUDGED** this the 5th day of April, 2012.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE